UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| D.T. AND D.T., PARENTS OF N.T., | CASE NO. C10-0759JLR |
| Petitioners, | ORDER ON ADMINISTRATIVE APPEAL |
| v. | |
| SEATTLE SCHOOL DISTRICT, | |
| Respondent. | |

## I.    INTRODUCTION

This is an appeal under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, by D.T. ("the Mother") and D.T. ("the Father") (collectively, "the Parents"), on behalf of their son, N.T. ("the Student"), from the decision of an administrative law judge ("ALJ") finding that the Parents did not carry their burden of proving that the Respondent Seattle School District ("the District") denied the Student a "free appropriate public education" ("FAPE") as required by the IDEA.  The Parents are proceeding *pro se*, as they did during the administrative proceedings.

When the Student, who is deaf, and the Parents moved into the District from California in 2006, the District proposed placing the Student in a public elementary school program for deaf and hard of hearing students. The Parents determined that the District's proposed placement would not meet the Student's needs, and they enrolled him, at their own expense, at a private school for hearing impaired children. The Parents also requested that the District change the Student's proposed placement to the private school and pay for his tuition. The District declined to do so. The Parents filed a due process hearing request, as permitted by the IDEA, and after the hearing, the ALJ concluded that the Parents failed to prove that the District's proposed placement would not provide the Student with a FAPE.

The Parents now appeal the ALJ's decision. The ultimate question before the court is whether the ALJ correctly found that the Parents did not carry their burden of establishing that the District denied the Student a FAPE by failing to offer him an appropriate placement and related services. Having reviewed the briefing of the parties, the administrative record, and the relevant law, and neither party having requested oral argument, the court DENIES the Parents' appeal and AFFIRMS the decision of the ALJ.

## II.    STATUTORY FRAMEWORK

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010) (quoting *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992)). The IDEA is designed "to ensure that all children with disabilities have available to them a free appropriate public education that

emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA defines a FAPE as:

> special education and related services that – (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate . . . elementary school . . . education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9). A FAPE is only a "basic floor of opportunity," and school districts do not need to "maximize each child's potential." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 198, 200-01 (1982).

The IDEA requires school districts to develop individual education programs ("IEP"), through an IEP team, for students with special education concerns, and to determine an appropriate educational placement that will provide the student with a FAPE. 20 U.S.C. § 1414; *see also Fresno Unified*, 626 F.3d at 432. In developing an IEP for a student who is deaf or hard of hearing, the IEP team must consider, among other factors, "the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode." 20 U.S.C. § 1414(d)(3)(B)(iv). The IDEA does not define "communication mode," however Washington State's regulations implementing the IDEA state that "[f]or an individual with deafness or blindness, or for an individual with no written language, the mode of

communication is that normally used by the individual, such as sign language, Braille, or oral communication." WAC 392-172A-01120.

A school district may violate the IDEA in two different ways. "First, a school district, in creating and implementing an IEP, can run afoul of the Act's procedural requirements."[1] *Fresno Unified*, 626 F.3d at 432 (citing *Rowley*, 458 U.S. at 176). "Second, a school district can be liable for a substantive violation by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits." *Id.*; *Rowley*, 458 U.S. at 200; *Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006). The educational benefit provided must be "meaningful" in order to satisfy the requirement of a FAPE. *Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1501 (9th Cir. 1996). If a school district does not make a FAPE available to a student and the student's parents elect to enroll him or her in an appropriate private school, a court or hearing officer may require the school district to reimburse the parents for the cost of enrollment. 20 U.S.C. § 1412(a)(10)(C); WAC 392-172A-04115(3).

## III.    BACKGROUND

**A. The Student's Background and Education Prior to Moving into the District**

The Student was first noted to have hearing loss when he was two and a half months old.[2] (Administrative Record Vol. 1 ("AR1") 15.) He received his first hearing

---

[1] The instant appeal does not involve any alleged procedural violations of the IDEA. (*See generally* Pet. Br. (Dkt. # 15).)

[2] Where the ALJ's findings of facts are undisputed and/or supported by a preponderance of the evidence, the court cites to his Findings of Facts, Conclusions of Law, and Final Order,

aids when he was four months old, and then received a cochlear implant when he was thirteen months old.  (*Id.*)  The Student initially did well with his cochlear implant.  (*Id.*)  His auditory and spoken language skills developed rapidly until the software for his cochlear implant was modified to a "high resolution" program when he was two years and nine months old.  (*Id.*)  The Parents immediately observed a regression of the Student's speech and language skills.  (*Id.*)  Although the high resolution software was eventually replaced with the original software, no improvement in the Student's speech and language skills was observed.  (*Id.*)

In September 2004, the Parents enrolled the Student in an oral preschool at the John Tracy Clinic in Los Angeles, California.  (*Id.*)  In March 2005, when the Student was four and a half years old, he received a speech and language evaluation, which determined that he had not yet established a formal language system.  (*Id.*)  The evaluation recommended that the Student's auditory and spoken language skills be supplemented with a visual communication system using a "total communication" program.  (*Id.*)  During the summer of 2005, the Student was enrolled in a total communication program at the George Washington School in California.  (*Id.*)  When he entered the program, the Student did not know any sign language.  (*Id.*)  He was taught Conceptually Accurate Signed English.  (*Id.*)  The Student continued in the total communication program during kindergarten in the 2005-2006 school year.  (*Id.*)

located in the Administrative Record, Vol. 1 at 12-30.  The court supplements the ALJ's specific findings with additional evidence in the record where appropriate.

In December 2005, shortly after his fifth birthday, the Student had a psychological evaluation. (*Id.* at 16.) The clinical psychologist who performed the evaluation diagnosed the Student with Attention Deficit/Hyperactivity Disorder, among other things. (*Id.*) The psychologist's recommendations for the Student included special educational services to address his speech and communication delays secondary to hearing loss and attentional problems, and instruction in a structured classroom with a small student-to-teacher ratio. (*Id.*)

In March 2006, the Student was assessed by a speech and language pathologist, who summarized her observations as follows: "[Student] has made progress with his language this year both receptively and expressively. When he entered this program [in] summer '05, he did not know any sign language. He is now able to communicate[] wants, needs, and comment and ask simple questions using total communication." (*Id.*; AR Vol. 3 ("AR3") 239.)

In May 2006, the Student had an occupational therapy evaluation. (AR1 16.) The evaluation report observed that the Student "has shown improvements in his use of sign language as well as verbal and nonverbal communications. . . . [The Student] is responding more to verbal and nonverbal directions and following through with therapist requests." (*Id.* (quoting AR3 254).) Also in May 2006, the Student received his last IEP in California, which called for him to receive specially designed instruction in the areas of pre-academic skills, writing, and math, and to receive related services in speech and language pathology, occupational therapy, and audiology. (*Id.*)

## B. The Student Moves into the District and Declines the District's Proposed Placement

In July 2006, the Parents and the Student moved to Seattle, Washington and began residing within the District. (*Id.*) The Parents sought to enroll the Student in the District, and the Student was initially assigned to the John Rogers Elementary School. (*Id.*) After the District received and reviewed the Student's educational records from California, the District proposed placing the Student in its Deaf and Hard of Hearing ("DHH") Program at The Option Program at Seward ("TOPS"), a District kindergarten through eighth grade school. (*Id.*) The DHH Program is a total communication program that uses all available means to ensure communication between the instructional staff and the students. (Tr. 892-895.)[3] Debra Limon, a special education consulting teacher in the District, testified at the due process hearing that "when we in Seattle Schools say total communication, we're referring to spoken oral English and Signed Exact English."[4] (Tr. 893.) Signed Exact English ("SEE") is a sign code that follows all of the grammatical markers, rules, and semantics of spoken English. (Tr. 923.) Ms. Limon further testified that based on

---

[3] The transcript from the due process hearing is contained in volumes four through eight of the administrative record and has its own pagination apart from the remainder of the administrative record. It is cited in this order as (Tr. __).

[4] Signed Exact English is also called Signing Exact English. Throughout the due process hearing, both parties used the terms interchangeably.

her extensive observation of the DHH Program classroom, Liz Hayden, the lead teacher for the deaf, primarily used SEE and oral English with her students.[5] (Tr. 892, 895.)

In September 2006, the Mother, along with a District psychologist, visited the DHH Program. (AR1 16; AR3 209; Tr. 110.) The Mother also visited the program twice in October 2006. (Tr. 110.) On each visit, the Mother stayed between two and three hours. (AR1 16; Tr. 110.) She testified that she observed the instructional staff members missing some signs, not signing the majority of words in a spoken sentence, and leaving out word endings and tenses. (AR1 17; Tr. 111.) She stated that she did not observe a single exact signed English sentence during her visits.[6] (Tr. 111.) The Mother also observed some students waiting in turn to work with an instructional staff person. (AR1 17; Tr. 112.)

Rather than enrolling the Student in the DHH Program, the Parents enrolled him in kindergarten at the Northwest School for Hearing Impaired Children ("Northwest") in September 2006. (AR1 17.) Northwest is a private school that is located in the Shoreline School District. (*Id.*) The Parents did not provide any prior written notice to the District that they were enrolling the Student at Northwest. (*Id.*)

---

[5] The ALJ did not make any specific findings of fact regarding the testimony of Ms. Limon, however he did conclude that the DHH Program included the use of SEE and simultaneously spoken English. (AR1 26.)

[6] The ALJ found that the Mother observed the instructional staff in the DHH Program using Signed Exact English ("SEE") and spoken English with the students, but that she was concerned about the quality and consistency of the signing. (AR1 17.) The Parents contend that this is an error of fact and that the Mother never saw SEE and simultaneous spoken English in the DHH Program on any of her visits. (Pet. Br. at 23.)

In December 2006, the District held an IEP meeting with one or both of the Parents. (*Id.*) During this meeting, the Parents informed the District that they intended to keep the Student at Northwest. (*Id.*) Shortly thereafter, the District sent the Parents a written notice, as required by the IDEA, informing them that it was proposing to suspend its efforts to provide services for the Student based upon the Parents' expressed intent to keep the Student enrolled at Northwest and their decision not to accept services from the District. (*Id.*)

In July 2007, the District received a letter from the Parents. (AR1 17; AR3 212.) Among other things, the letter informed the District that the Shoreline School District would be conducting an evaluation of the student, and inquired what the Parents could expect from the District to meet the Student's educational needs. (AR1 17; AR3 212.) In August 2007, the District's Special Education Supervisor, Becky Clifford, responded to the Parents' letter. (AR1 17.) Ms. Clifford stated that she had reviewed the Student's records and summarized the District's understanding of events from the time the Parents sought enrollment of the Student. (AR1 17; AR3 209.) Ms. Clifford explained that the District's proposed placement of the Student in the DHH Program was based upon a review of the Student's educational records from California, including his IEP dated May 23, 2006. (AR1 17; AR3 209.) The letter further explained that the California records also included the Student's last evaluation from December 2005, which the District had determined was thorough; therefore, the District would not conduct another triennial evaluation until December 2008. (AR1 17; AR3 210.) Ms. Clifford informed the Parents that the District was prepared to provide ancillary special education services to the

Student if he returned to the District on either a part-time or full-time basis.  (AR1 17-18; AR3 210.)  She concluded by explaining that once the Student was enrolled in the District, an IEP meeting would be held to determine an appropriate educational placement.  (AR1 18; AR3 210.)

**C. The Student Enrolls in the District but Again Declines the Proposed Placement**

The Student attended first grade at Northwest during the 2007-2008 school year.  (AR1 18.)  Nevertheless, during the fall of 2007, the Mother visited and observed the DHH Program on two occasions.  (AR1 18; Tr. 110.)  The Mother observed that there were students from grades kindergarten through fifth grade in one classroom with two or three teachers of the deaf.  (AR1 18; Tr. 116-17.)  The single classroom was divided into smaller sections with the use of portable screens.  (AR 18; Tr. 118.)  The Mother observed what she considered to be more inconsistent signing than she observed in 2006, as well as the use of some American Sign Language ("ASL") signs.  (AR1 18; Tr. 116-17.)  During this time, students from the District's ASL program were spending mornings in the classroom.  (AR1 18; Tr. 116-17.)  The Mother observed the ASL students turning off their voices when they signed with each other.  (AR1 18; Tr. 117.)  At times, there were multiple teachers instructing small groups of students at the same time.  (AR1 18; Tr. 117.)  The Mother also observed that the instructional staff did not always sign when speaking to each other.  (AR1 18; Tr. 117.)

In November 2007, the Parents enrolled the Student in the District so that he could access some of the services provided for in his IEP, however he continued to attend school at Northwest.  (AR1 18.)

1    Also in November 2007, the Shoreline School District conducted a reevaluation of

2  the Student. (*Id.*) The evaluation concluded that the Student met the eligibility criteria

3  for special education under the category of deafness. (*Id.*) The evaluation recommended

4  that the Student receive specially designed instruction ("SDI") in communication,

5  literacy, math, signing, and self-advocacy, with related services for speech and language,

6  and auditory training. (*Id.*) Among other things, the evaluation recommended that the

7  Student receive a personal FM system and audiology consultations. (*Id.*)

8    On December 6, 2007, the District held an IEP team meeting for the Student. (*Id.*)

9  The proposed IEP called for the Student to receive SDI in literacy, math, and classroom

10 communication from a DHH Program teacher in the DHH Program classroom. (*Id.*) The

11 IEP also called for the Student to receive audiology services from an audiologist in a

12 classroom. (*Id.*) The proposed placement was at the DHH Program at TOPS. (*Id.*)

13 **D. The Student Accepts the Audiology Services Provided for in his IEP**

14    In January 2008, the Parents notified the District that they would accept the

15 audiology services provided for in the IEP. (AR1 19.) The IEP called for the Student to

16 receive audiology services for thirty minutes per week. (*Id.*) The audiologist worked

17 with the Student on the self-advocacy goal of his IEP and also provided support for the

18 Student's FM systems. (*Id.*) The Mother transported the Student to and from the

19 audiologist's office. (*Id.*) The audiologist had agreed to provide the Student's services at

20 her office because her office was located closer to the Student's home than TOPS. (*Id.*)

21 Initially, this arrangement required the Student to arrive tardy or leave school early to

22 receive his audiology services. (*Id.*) The audiologist offered to see the Student outside of

her normal hours, either before or after the Student's school day, in order to better accommodate the Student. (*Id.*) The audiologist also offered to provide the Student's services for 60 minutes every other week, rather than for 30 minutes every week so that the Student would have less disruption to his school schedule. (*Id.*) The Parents accepted the audiologist's offers, and the Student received his audiology services for 60 minutes every other week. (*Id.*)

**E. The Parents Ask the District to Change the Student's Proposed Placement from the DHH Program to Northwest, and the District Declines**

At some point prior to January 16, 2008, the Parents requested that the District change the Student's proposed placement from the DHH Program to Northwest. (*Id.*) On January 16, 2008, the District sent the Parents a written notice informing them that the District was refusing to place the Student at Northwest because it had an appropriate placement at the DHH Program. (*Id.*)

In the fall of 2008, the Student began attending the second grade at Northwest. (*Id.*) On October 28, 2008, the Parents sent a letter to the District, which set out the reasons why the Parents believed that the Student required a placement at Northwest and requested that the District pay for his placement there. (*Id.*) On November 20, 2008, Michael Sanford, the District's special education supervisor, wrote to the Parents in response to their October 28, 2008 letter. (*Id.*) Mr. Sanford's letter informed the Parents that the District would not fund the Student's private placement at Northwest because the DHH Program could provide an educational opportunity that would meet the Student's needs. (*Id.*) Then on December 5, 2008, the District sent the Parents two written notices,

1 informing them that the District was proposing to continue the Student's audiology

2 services and use of the FM systems but was refusing to change the Student's placement

3 to Northwest.  (AR1 21.)

4     In January 2009, the Mother visited the DHH Program again and observed

5 substantially the same use of sign language that she had observed in prior years.  (*Id.*)

6 This year, however, the class size was smaller and there was one teacher for the deaf,

7 along with additional instructional aides.  (*Id.*)

8 **F.  The Parents Request and Receive a Due Process Hearing**

9      On May 13, 2009, the Parents filed a due process hearing request ("the Due

10 Process Complaint") with the Office of the Superintendent of Public Instruction

11 ("OSPI").  (*Id.*)  The Due Process Complaint raised four issues: (1) failure to provide a

12 FAPE; (2) failure to provide audiology services at the student's school, as required by the

13 IEP; (3) failure to provide speech and language services as required by the IEP; and (4)

14 failure to provide services to the student in his mode of communication, SEE.  (Compl.

15 (Dkt. # 1) ¶ 3.25.)

16     The OSPI forwarded the Due Process Complaint to the Office of Administrative

17 Hearings, and the matter was assigned to ALJ Matthew D. Wacker.  (AR1 13.)  After

18 holding a telephonic prehearing conference with the parties, the ALJ entered a prehearing

19 order on June 22, 2009, which memorialized the outcome of the prehearing conference

20 and notified the parties that they had ten days to object before the order would become

21 controlling for the subsequent course of the proceeding.  (AR1 185.)  Neither party

22 objected to the prehearing order within the ten-day timeframe.

The prehearing order defined the three issues for the hearing.  (AR1 13.)  First, whether the District denied the Student a FAPE at any time from May 13, 2007, through May 13, 2009, by (1) offering the Student an educational placement with other students from kindergarten through fifth grade in one classroom, along with one teacher and other instructional aides; (2) offering the Student an educational placement which does not include any other students of his same grade; (3) offering the Student an educational placement which does not include the use of SEE as an instructional methodology; (4) failing to provide the Student with the speech and language services in his IEPs at his school environment by a speech-language pathologist who uses SEE; (5) failing to provide the Student with the audiology services in his IEP at his school environment; and/or (6) failing to provide the Parents with sufficient notice of IEP meetings.[7]  (AR1 14.)  Second, whether the Parents' unilateral private educational placement of the Student at Northwest is appropriate.  (*Id.*)  And third, whether the Parents were entitled to their requested remedies, which included payment of the Student's tuition at Northwest and the provision of audiology services at Northwest.  (AR1 15.)

The hearing was held on September 14, 15, 16, 17, and December 17, 2009.  (AR1 13.)  The ALJ heard testimony from ten witnesses.  (AR1 14.)  In addition to hearing testimony that established the facts already discussed in this section, the ALJ heard from Sara Wyckoff, a private occupational therapist, who worked with the Student.  (AR1 22.)

---

[7] Sub-issues (2), (4), and (6) are not relevant to the instant appeal, therefore the court does not discuss the additional facts developed at the due process hearing that pertain solely to these issues.

Ms. Wyckoff diagnosed the Student with sensory integration disorder ("SID"), which is consistent with the diagnosis that the Student received when he was four years old. (*Id.*) At the hearing, Ms. Wyckoff gave substantial testimony regarding the effects of the Student's SID on his ability to function in his classroom at Northwest and the Student's need for an appropriate learning environment. (*Id.*) Ms. Wyckoff, however, testified that she had no knowledge of the District's proposed placement for the Student in the DHH Program. (*Id.*) Moreover, no evidence indicated that any of the information she provided during the hearing was made known to the District prior to the hearing. (*Id.*)

The ALJ also heard extensive testimony from Dr. Peggy Mayer, the coordinator for teacher education and research at Northwest, and Dr. Emily Palik-Killian, who was the student's first grade teacher at Northwest during the 2007-2008 school year. (*Id.*) Their testimony primarily concerned the circumstances of the Student's educational placement at Northwest, the progress he has made there, and the difficulties he could face in other types of educational placements. (*Id.*) But like Ms. Wyckoff, neither witness had current, first-hand knowledge of the DHH Program. (*Id.*)

**G. The ALJ's Decision**

On February 3, 2010, the ALJ issued his Findings of Fact, Conclusions of Law, and Final Order. (AR1 13.) As of that time, the Student remained enrolled at Northwest and had never attended the DHH Program at TOPS. (AR1 17.) The ALJ concluded that, beginning on February 25, 2008, the District had denied the Student a FAPE to the limited extent that it failed to offer the Student the speech and language pathology services provided for in his IEPs by a speech and language pathologist who had a basic

knowledge of sign language.  (AR1 30.)  The ALJ also found that the Parents failed to

prove[8] that the District's proposed placement of the Student in the DHH Program denied

the Student a FAPE, and accordingly denied their request that the District pay for the

Student's education at Northwest.  (AR1 30.)  Because of this conclusion, the ALJ did

not make findings of fact or conclusions of law regarding whether Northwest was an

appropriate placement for the Student.  (AR1 22.)

**H. The Parents' Appeal the ALJ's Decision**

On May 5, 2010, the Parents filed a petition for judicial review of the ALJ's

decision in this court.  (Compl.)  On November 29, 2010, the Parents filed their opening

brief, claiming that the ALJ erred by: (1) concluding that SEE is a instructional

methodology rather than a mode of communication; (2) finding that the Parents did not

prove that the Student could not receive an educational benefit at the District's proposed

placement; (3) concluding that the District is not responsible for providing a educational

placement based on the Student's mode of communication; (4) finding that the District's

proposed placement, rather than Northwest, was appropriate; (5) finding that the parents

failed to establish that the District's multi-age, multi-grade, simultaneous group

instruction would impede the Student's ability to learn due to his SDI; and (6) finding

that the District sufficiently implemented the Student's IEP when the audiology services

were not provided at Northwest.  (Pet. Br. (Dkt. # 15) at 2-3.)  In short, the Parents

challenged the ALJ's determination that (1) they failed to meet their burden of showing

---

[8] The burden of proof in a due process hearing under the IDEA is on the party seeking relief.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005).

that the DHH Program would not have provided the Student with a FAPE; and (2) the District did not violate the IDEA by providing audiology services at the audiologist's office rather than at Northwest.  (*See generally* Pet. Br.)  The District filed its response brief on December 27, 2010 (Resp. (Dkt. # 18)), and the Parents filed their reply on January 1, 2011 (Reply (Dkt. # 19)).  This order follows.

## IV.   DISCUSSION

### A. Standard of Review

In an appeal from a due process hearing under the IDEA, the court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see also Fresno Unified*, 626 F.3d at 438.  Under this standard, "complete de novo review of the administrative proceeding is inappropriate."  *Fresno Unified*, 626 F.3d at 438 (quoting *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007)).  The court, however, gives "less deference [under the IDEA] than is conventional in review of other agency actions."  *Id.* (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)).  "How *much* deference to give state educational agencies, however, is a matter for the discretion of the courts."  *Id.* (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).

> The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply.  This does not mean, however, that the findings can be ignored.  The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing

officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

*Gregory K.*, 811 F.2d at 1311 (quoting *Town of Burlington v. Dept. of Ed.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)); *see also Fresno Unified*, 626 F.3d at 438.

At the same time, when reviewing the decision of the ALJ, the court "must give 'due weight' to judgments of education policy." *Gregory K.*, 811 F.2d at 1311 (quoting *Rowley*, 458 U.S. at 206). "[C]ourts should not substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* (quoting *Wilson v. Marana Unified Sch. Dist. No. 6 of Pima Cnty.*, 735 F.2d 1178, 1183 (9th Cir. 1984)); *see also Rowley*, 458 U.S. at 207 ("In assuring that the requirements of the [IDEA] have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States."). Further, "[t]he amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). The party appealing the ALJ's decision "bears the burden of demonstrating that the ALJ's decision should be reversed." *Fresno Unified*, 626 F.3d at 438 (citing *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994)).

**B. Whether the ALJ Erred in Concluding that the Parents Failed to Meet their Burden of Proving that the District Denied the Student a FAPE by Offering Him Placement at the DHH Program at TOPS**

The Parents argue that the District's proposed placement at the DHH Program would not have provided the Student with a meaningful educational benefit because: (1) it was similar to the California program where the Student did not make progress; and (2) it did not offer the Student instruction in SEE with simultaneous spoken English. (Pet. Br. at 21.) After a careful review of the administrative record and consideration of the ALJ's findings of fact and conclusions of law, the court determines that the Parents have not met their burden of showing that the ALJ erred in holding that they did not prove by a preponderance of the evidence that the District's proposed placement in the DHH Program would not have provided the Student with a meaningful educational benefit.

The central difficulty with the Parents' case is the fact that the Student was never enrolled in the DHH Program; therefore, the Parents' concerns about whether the Student would receive a meaningful educational benefit at the DHH Program are speculative. As the ALJ recognized, "the Parents have effectively asked this tribunal to speculate whether or not the Student could or could not have obtained an educational benefit from the DHH [Program] based upon scant evidence at best." (AR1 27.) The court agrees that the evidence presented by the Parents was insufficient to satisfy their burden of showing that a program that the Student never attended would not have provided him with a meaningful educational benefit.

### 1. Evidence Regarding the George Washington School in California

As evidence that the Student would not have received a meaningful educational benefit in the DHH Program, the Parents point to similarities between the DHH Program and the program at the George Washington School in California, where they argue that the Student received no educational benefit.[9] (Pet. Br. at 4-5, 13-14, 20-21.) The Mother testified that the George Washington School was a total communication program that used Conceptually Accurate Signed English, which involves signing key words using ASL signs. (Tr. 99.) She testified that the signing used at the George Washington School was similar to that used during her observations of the DHH Program in that the teachers did not sign every word and did not sign when they were talking to each other. (Tr. 103.) Furthermore, the Mother testified that there were approximately 15 children in the George Washington School classroom of various ages, many activities going on simultaneously, and staff coming and going, which made it difficult for the Student to focus. (Tr. 99-104.) According to the Mother, the DHH Program was a similar size and had a similar activity level as the George Washington School. (*Id.*)

The Parents argue that these similarities are important because the Student received no educational benefit at the George Washington School and thus would not

_____

[9] The ALJ's decision did not make findings of fact or conclusions of law regarding the similarities between the George Washington School and the DHH Program. During the administrative hearing, the District's attorney objected on relevance grounds to the Mother's testimony regarding the George Washington School. (Tr. 102.) The ALJ allowed the testimony but indicated that he would not consider the Student's experience at the George Washington School to be particularly relevant, unless the Parents presented hard evidence regarding the similarities between that program and the DHH Program. (Tr. 102-03.) The only evidence the Parents presented was the Mother's observations and opinions about the two programs.

1  have benefited from the DHH Program. (Pet. Br. at 4-5, 13-14, 20-21.) The Mother

2  testified that the Student made little progress at the George Washington School and that

3  he was unable to communicate. (Tr. 99.) Dr. Mayer also testified that when the Student

4  began at Northwest in September 2006, his language skills were much delayed and that

5  his language was nonfunctional. (Tr. 261.)

6       Although there is no serious dispute that the Student had significantly delayed

7  language skills when he left the George Washington School at the end of the 2005-2006

8  school year, the relevant issue is whether the Parents proved beyond a preponderance of

9  the evidence that he received no meaningful benefit from that program. If he did not

10  benefit, then the next question is whether the Parents presented sufficient evidence upon

11  which to conclude that the George Washington School and DHH Program were so

12  similar that the Student would not have benefited from the DHH Program. For the

13  reasons described below, the court concludes that the Parents did not meet their burden

14  on either issue.

15       With respect to the first issue, the court notes that there is no objective evidence in

16  the record regarding the Student's progress at the George Washington School, however,

17  there are subjective assessments from two therapists in California that indicate that he did

18  receive some meaningful benefit from the program there. In March 2006, a speech and

19  language pathologist assessed the Student and found that he "made progress with his

20  language this year both receptively and expressively. When he entered this program [in]

21  summer '05, he did not know any sign language. He is now able to communicate[]

22  wants, needs, and comment and ask simple questions using total communication." (AR3

239.)  An occupational therapy evaluation around that same time also stated that the

Student "has shown improvements in his use of sign language as well as verbal and

nonverbal communications."  (AR3 254.)  The only contrary evidence regarding the

Student's progress at the George Washington School was the Mother's testimony on the

issue.  Given the balance of the record on the issue, the court concludes that the Parents

did not prove by a preponderance of the evidence that the Student received no meaningful

benefit at the George Washington School.  In fact, the evidence suggests that he obtained

some meaningful benefit, which is all that is required under the IDEA.  *See Rowley*, 458

U.S. at 200; *B.S.*, 82 F.3d at 1501.  As such, comparing the DHH Program to the George

Washington School does not advance the Parents' argument that the DHH Program

would not have provided the Student with a FAPE.

Furthermore, even if the evidence established that the George Washington School

did not afford the Student a FAPE, the evidence in the administrative record is simply

insufficient to prove that the Student would have had the same experience in the DHH

Program.  The only evidence offered on the issue was the Mother's general observations.

As noted previously, during the due process hearing, the ALJ expressed doubt as to

whether this testimony would assist him in determining whether the DHH Program would

have denied the Student a FAPE because the Mother did not present any hard evidence

regarding the similarities between the programs.  (Tr. 102-03.)  The ALJ made no

findings of fact or conclusions of law regarding this issue, indicating that he found the

Parents' argument to be meritless.  (AR1 30 (noting that all arguments not addressed in

the ALJ decision were carefully considered by the ALJ and found to be meritless).)

1    The court concurs that in this case, there is insufficient evidence in the record for it

2    to make a comparison between the George Washington School and the DHH Program.

3    Although the ALJ heard testimony from administrators and consulting teachers in the

4    District regarding the DHH Program, no administrators or teachers at the George

5    Washington School testified regarding their program.  Similarly, the District presented

6    evidence regarding the experience and qualifications of Ms. Hayden, the teacher for the

7    deaf in the DHH Program, but the Parents did not present evidence regarding the

8    qualifications and experience of the teachers at the George Washington School.  In

9    addition, the Mother testified to the size of the classroom at the George Washington

10   School, but she did not testify to the student-to-teacher ratio, which would provide a

11   further point of comparison between the two programs.  The Parents, moreover, did not

12   present an expert opinion regarding the similarities and differences between the two

13   programs.  In sum, the court is unable to determine, based on the evidence presented by

14   the Parents, that the DHH Program would not have provided an educational benefit to the

15   Student because it was similar to the George Washington School.  As such, the Parents

16   did not satisfy their burden on this issue.

17        The Parents also argue that they submitted evidence that the Student could not

18   learn in either the George Washington School or DHH Program because they were both

19   multi-age, multi-grade classrooms with simultaneous group instruction and did not have

20   small enough class sizes.  (Pet. Br. at 3, 20-21.)  The ALJ concluded that the evaluations

21   or testing that the Student received do not support the Parents' position (AR1 27), and the

22   court agrees.  The Student's psychological evaluation from December 2005

recommended that he receive instruction in a structured classroom with a small student-to-teacher *ratio*, but the report did not discuss the need for a small class *size*.  (AR3 248-254.)  Further, the evaluator did not recommend that the Student be placed in a classroom with a single grade or age group or in a classroom where there is no simultaneous instruction of different groups of students by different instructors.  (AR3 248-254.)  Similarly, the Shoreline School District's reevaluation report from November 2007 does not discuss the need for a particular class size, small number of simultaneously ongoing activities, age group, or grade.  (AR3 213-231).  Accordingly, the Parents have not met their burden of establishing that the Student could not obtain a meaningful educational benefit in the DHH Program classroom.

### 2.  Signing Exact English with Simultaneous Spoken English

The Parents argue that the IDEA requires the District to provide the Student with a placement that uses SEE with simultaneous spoken English—his mode of communication—and that they presented evidence that the DHH Program did not use SEE with simultaneous spoken English.  (Pet. Br. at 20-23.)  The ALJ concluded that the District did offer the Student a placement that used SEE and oral English, and that the Parents did not prove that the Student could not receive a meaningful educational benefit at the DHH Program.  (AR1 26-27.)  The ALJ also determined that the District's choice of sign code should be viewed as an educational methodology warranting deference, but that even if it was viewed as a mode of communication, as the Parents maintained, the District was not required to offer the Student a placement using his particular sign code.  (*Id.*)  On appeal, the Parents take issue with the ALJ's conclusions that (1) the District is

not responsible for providing an educational placement that utilizes the Student's mode of communication, SEE with simultaneous spoken English; (2) SEE is an instructional methodology rather than a mode of communication; and (3) the DHH Program used SEE with simultaneous spoken English. (Pet. Br. at 2-3.) The court addresses these arguments below but finds them unpersuasive.

First, the IDEA does not require the District to offer the Student a placement using his particular sign code, but it does require the District to offer him a placement that provides him with a meaningful benefit. The Washington State regulations implementing the IDEA state, "For an individual with deafness or blindness, or for an individual with no written language, the mode of communication is that normally used by the individual, *such as sign language, Braille, or oral communication*." WAC 392-172A-01120 (emphasis added). The regulations thus define the mode of communication for deaf individuals broadly as sign language, rather than narrowly as an individual's particular sign code. For the Student, then, his mode of communication, as that term is used in the regulations, is sign language generally, not SEE and oral English.

This interpretation aligns with the Eight Circuit's decision in *Petersen v. Hastings Public Schools*, 31 F.3d 705 (8th Cir. 1994), upon which the ALJ relied. In *Petersen*, parents of deaf children who used a strict SEE system at home challenged the school district's use of a modified SEE system in the classroom. *Id.* at 705-06. The court held that the IDEA does not require school districts to employ the sign code used by students in their home; it requires them "to implement a signing system that is reasonably calculated to confer educational benefits." *Id.* at 708. The court further stated: "Were we

1  to conclude that parents could demand that their children be taught with a specific signing

2  system, we would be creating the potential that a school district could be required to

3  provide more than one method of signing for different students whose parents had

4  differing preferences." *Id.* Ultimately, the court determined that the students were

5  receiving an educational benefit using the modified SEE system, thus the school district

6  did not violate the IDEA. *Id.*

7      This court agrees with the *Petersen* court that the relevant inquiry is whether the

8  sign code used by the school district is reasonably calculated to confer educational

9  benefits, rather than whether the sign code is used in the student's home. This approach

10 complies with the Supreme Court's mandate that "courts must be careful to avoid

11 imposing their view of preferable educational methods upon the States." *Rowley*, 458

12 U.S. at 207. In this case, the Parents did not establish by a preponderance of the evidence

13 that the sign code used in the DHH Program was not reasonably calculated to provide the

14 Student with a meaningful educational benefit. The fact that the Student never attended

15 the DHH Program has resulted in a dearth of direct evidence on the issue. As the ALJ

16 explained, "This is not a situation where a student has attended an educational placement

17 for some period of time and experienced a demonstrable lack of any meaningful benefit

18 based upon grades, assessments or other objective information." (AR1 27.) Further, as

19 the court has already discussed, the evidence regarding the George Washington School is

20 too tenuous to prove that the Student would not have received a meaningful educational

21 benefit in the DHH Program.

22

The court also concludes that the ALJ did not err in treating the choice of sign code used by the District as an educational methodology, rather than a mode of communication. Both Dr. Mayer and Ms. Limon testified that total communication using SEE and oral English are teaching or educational methodologies. (AR1 at 26; Tr. 227, 932.) Moreover, courts have treated similar issues as ones of educational methodology. *See, e.g., Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988) (holding that the district's choice of using total communication for a deaf child rather than the parent's choice of cued speech was a question of educational methodology, which was entitled to deference by the court); *Petersen*, 31 F.3d at 707 (noting that the court would not substitute its "own notions of sound educational policy for those of the school authorities" in deciding whether the school district's choice of using a modified SEE system denied the students a FAPE (quoting *Rowley*, 458 U.S. at 206)).

Finally, the court notes that whether the DHH Program utilized SEE with oral English or another form of signed English is not dispositive here. Regardless of the sign code used, there was insufficient evidence to establish that the Student could not benefit from it, as discussed above. Moreover, although the Parents dispute the ALJ's finding that the Mother observed SEE being used in the DHH Program classroom but that she was concerned with the quality and consistency of it, the ALJ's ultimate conclusion that SEE and oral English was used in the DHH Program classroom is supported by the testimony of Ms. Limon. (*See, e.g.*, Tr. 891, 893.) In sum, the Parents have not presented the court with any reason that warrants reversal of the ALJ's decision.

**C.  Whether the District Denied the Student a FAPE by Providing Audiology Services at a Location Other than that Provided for in his IEP**

The Parents argue that the ALJ erred in finding that the District did not deny the Student a FAPE by providing his audiology services at the audiologist's office rather than at Northwest.  (Pet. Br. at 3, 22.)  It is undisputed that the Student's 2007, 2008, and 2009 IEPs called for him to receive audiology services a classroom or school environment, but that he met with his audiologist in her office.  (AR3 163, 172, 207; Tr. 138, 169.)  Nevertheless, as explained in more detail below, the law does not require the District to provide the services at the Student's private placement because it had offered him a FAPE at the DHH Program.

Where a school district has made a FAPE available to a student, the IDEA "does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility."  20 U.S.C. § 1412(a)(10)(c)(i); *see also* 34 C.F.R. § 300.137 ("No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school.").  "Instead, parentally-placed private school students are governed by a different framework under the IDEA."  *Bd. of Educ. of the Appoquinimink Sch. Dist. v. Johnson*, 543 F. Supp. 2d 351, 358 (D. Del. 2008); *see also* 20 U.S.C. §§ 1412(a)(10)(A)(i)-(ii).

Under this framework, "[p]arentally-placed private school children may receive a different amount of services than children with disabilities in public schools."  34 C.F.R. § 300.138.  Specifically, the IDEA authorizes school districts to provide services on the

premises of a private school, but it does not require that the services be provided there. 20 U.S.C. § 1412(a)(1)(A)(i)(III); 34 C.F.R. § 300.139(a) ("Services to parentally-placed private school children with disabilities *may* be provided on the premises of private . . . schools, to the extent consistent with law.") (emphasis added). Because the law does not require it, the Student is not entitled to receive audiology services at Northwest. Therefore, the ALJ did not err in concluding that the District did not deny the Student a FAPE because the Student met with the audiologist at her office rather than at Northwest.

## V.    CONCLUSION

For the foregoing reasons, the court DENIES the Parent's administrative appeal and AFFIRMS the decision of the ALJ.

Dated this 2nd day of November, 2011.

JAMES L. ROBART
United States District Judge